# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

S. MICHAEL BENDER           )
                              )
            Plaintiff,       )
                              )
     v.                      )
                              )  Civil Action No.: 04-1301 (RBW)
JON W. DUDAS,             )
     Director of the United States   )
     Patent and Trademark Office,  )
                              )
                              )
            Defendant.     )
_____)

## MEMORANDUM OPINION

The plaintiff, S. Michael Bender ("Bender"), brings this action against the defendant, Jon W. Dudas ("Dudas"), Director of the United States Patent and Trademark Office ("PTO"), pursuant to 35 U.S.C. § 32 (2000), challenging the Director's Final Decision precluding him from practicing law before the PTO.  Complaint ("Compl.") ¶¶ 2, 6.   Currently before the Court is the Plaintiff's Motion for Summary Judgment and Memorandum in Support Thereof ("Pl.'s Mot."), requesting this Court to vacate the Director's Final Decision, and the defendant's Cross-Motion for Summary Judgment, which asks this Court to grant summary judgment in its favor with respect to the Director's Final Decision on the grounds that it was reasonable, lawful, and supported by substantial evidence in the record.  Defendant's Cross-Motion for Summary Judgment ("Def.'s Mot.").  For the reasons discussed below, the plaintiff's motion for summary judgment is denied and the defendant's motion for summary judgment is granted.

### I.  Background

Bender is an attorney who has been practicing patent law since 1966.  Plaintiff's Statement

of Undisputed Material Facts ("Pl.'s Stmt.") ¶ 59.  In 1993, Bender assumed the prosecution of a

large number of patents before the PTO formerly handled by another attorney, Leon Gilden

("Gilden"). Pl.'s Stmt. ¶ 1.  At that time, Gilden was involved in disciplinary proceedings which

stemmed from Gilden's filing of over 1000 patent applications "under the auspices" of American

Inventor's Corporation ("AIC"), an invention marketing company. Id. ¶¶ 2, 3.  The disciplinary

proceedings resulted from the PTO's discovery that Gilden, or someone associated with his office,

had "embellished the drawings in each application with a unique decorative pattern of surface

indicia," a tactic allegedly employed for the purpose of obtaining a patent for each application and

"avoid[ing] a refund of AIC's service fee under a guarantee clause contained in some, but not all

of the contracts between each inventor and AIC."  Id. ¶ 4.  The matter was ultimately settled with

Gilden receiving a 5-month suspension from practicing before the PTO.  Id. ¶ 2.

    In assuming Gilden's cases, Bender entered into an agreement with AIC that required the

company to pay him for his work and the associated costs on the patent cases.  Id. ¶ 6.  At some

point, the PTO discovered Bender's relationship with AIC and began sending him "disciplinary

letters in the form of Requirements for Information" ("RFIs"); ultimately the PTO sent Bender at

least 20 such letters.  Id. ¶¶ 7-8, 28.  The letters were all signed by Harry I. Moatz ("Moatz"), who

was at the time an investigator in the PTO's Office of Enrollment Discipline ("OED"); Moatz

eventually became the OED's Director.  Id. ¶¶ 38, 42, 47.  On September 18, 1998, the PTO sent

Bender an RFI that required him to answer questions concerning his representation of several

clients associated with AIC.  Defendant's Statement of Material Facts with respect to which there

is No Genuine Issue ("Def.'s Stmt.") ¶ 17.  In August, 1999, Moatz called a meeting of the

Committee on Discipline ("Committee") to determine whether there was probable cause to bring

charges against Bender and presented evidence to the Committee procured during his

investigation of Bender.  Compl. ¶ 48, 50.  The Committee determined that there was probable

cause, and an administrative Complaint and Notice of Proceedings, dated June 20, 2000, and

signed by Moatz, was served on Bender.  Id. ¶ 56.  The complaint set forth 10 counts alleging

violations of the PTO's rules governing attorney conduct in conjunction with Bender's

representation of nine AIC related clients and one other client that was associated with another

invention promotion company named "Phase 2."  Pl.'s Stmt. ¶¶ 33-34.  Each count of the

administrative complaint related to a particular inventor and multiple rules violations.  See

generally Administrative Complaint ("Admin. Compl.").

     Administrative Law Judge ("ALJ") William B. Moran presided over Bender's hearing on

the allegations charged in the complaint, which occurred on March 26 through March 29, 2001.

Initial Decision of the ALJ ("ALJ Decision") at 1.[1]  The ALJ found that Bender had violated

several provisions of the PTO's rules on attorney conduct, which resulted in his exclusion from

practice before the PTO.  ALJ Decision at 44-48.  Bender appealed the ALJ Decision and a Final

Decision ("GC Decision") was then issued by James A. Toupin (Toupin"), General Counsel of the

PTO, which concluded that some of the ALJ's rules violation findings against Bender were in

error, but that others were not.[2]  Specifically, the GC Decision reversed the ALJ's decision with

---

    [1]  Pursuant to Local Rule 83.7, Bender filed a copy of the administrative record with this Court on
September 24, 2004.  See plaintiff's Notice of Filing.  The administrative record contains, inter alia, the
administrative complaint, the administrative law judge's decision and the general counsel's decision.  Because both
parties rely extensively on the content of these documents, and because this Court's review also depends in part on
an examination of these documents, they will be cited to directly throughout this opinion.

    [2]  The Under Secretary of Commerce for Intellectual Property and the Director of the PTO delegated to
Toupin on January 31, 2002, the authority to decide appeals from the initial decision and to issue decisions pursuant
to 37 C.F.R § 10.156.  GC Decision at 47 n.5.

3

respect to 18 of the violation findings, and sustained the ALJ's decision with respect to 21 of the

violation findings.[3]  GC Decision at 39-40.  Toupin concluded that the ALJ correctly found that

Bender violated several PTO disciplinary regulations, which are set forth in Chapter 37 of the

Code of Federal Regulations ("C.F.R.").  Namely, Toupin found that Bender violated 37 C.F.R. §

10.23(b)(5) (2000), which prohibits PTO practitioners from engaging in conduct that is prejudicial

to the administration of justice; 37 C.F.R. § 10.62(a) (2000), which prohibits PTO practitioners

from accepting employment where the practitioners's professional judgment may be affected by

his own interests; 37 C.F.R. § 10.68(a)(1) (2000), which prohibits PTO practitioners from

accepting compensation from a person other than his own client; and 37 C.F.R. § 10.77(c) (2000),

which prohibits PTO practitioners from neglecting a legal matter entrusted to the practitioner.  GC

Decision at 1.  As to these violations, the GC Decision thoroughly explained why the ALJ's

findings of the violations were both factually and legally correct.  GC Decision at 20-36 (internal

evidentiary references omitted).  The GC Decision also addressed and rebutted Bender's

challenges to the ALJ's findings, as well as various arguments raised by Bender.  Id.  Specifically,

Bender raised several questions with respect to the sufficiency of the administrative complaint, id.

at 4-9; the PTO's compliance with the Administrative Procedure Act ("APA"), id. at 9-11; the

PTO's jurisdiction to sanction practitioners like Bender and the related issue of state law

preemption, id. at 12; the meeting conducted by the Committee on Discipline and whether its

finding of probable cause to file the administrative complaint constituted an adjudication, id. at

13; the ALJ's exclusion of certain evidence and whether the exclusions were proper, id. at 14-16;

---

[3]  As indicated, each count of the administrative complaint pertains to a particular client of Bender.  With
the exception of count 2, which is not at issue in this case because the violation therein was not sustained by the GC
Decision, each count consists of four or five core allegations that apply to each of Bender's clients.

whether the ALJ was biased and whether his appointment was proper, id. at 16-18; whether expert testimony was required in the case, id. at 18; whether the ALJ's decision not to dismiss the counts where witness testimony was not adduced was correct, id. at 18-19; whether certain violations found by the ALJ cannot be sustained based on the ALJ's findings of fact and whether other findings of fact were warranted, id. at 36-38, and whether the sanction of exclusion from practice before the PTO was appropriate, id. at 40.

In response to Bender's Request for Reconsideration of the GC Decision, the PTO, pursuant to 37 C.F.R. § 10.156(c) (2004), issued its decision on July 26, 2004, upholding the GC Decision in its entirety.[4]  Defendant's Memorandum of Points and Authorities in Support of his Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Def's Mem.") at 5.

Now, in this action filed in this Court, Bender raises many of the same objections and arguments that he raised before the PTO, as well as new arguments based on the GC Decision. Currently before this Court are the parties' cross-motions for summary judgment.  Some of these arguments question the factual basis for the administrative law judge's and general counsel's conclusions.  Other arguments allege procedural and due process violations, lack of jurisdiction, and improper application of statutory and case law and agency regulations.  Each of these arguments are discussed below.

## II.  Standard of Review

"Summary judgment is an appropriate procedure for resolving a challenge to an agency's administrative decision when review is based upon the administrative record." R.D. ex rel.

---

[4]  The only correction of the GC Decision was the removal of an erroneous footnote.  Def.'s Mem. at 5.

<u>Kareem v. District of Columbia</u>, 374 F. Supp. 2d 84, 89 (D.C. Cir. 2005) (citing <u>Richards v. I.N.S.</u>, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  "By its very terms, [the summary judgment] standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported  motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The material facts in this case are those that pertain to the disciplinary violations upheld in the GC Decision.[5]  This Court's review of the parties' statements of material fact as well as the administrative record confirms that there are no genuine issues of material fact in dispute with respect to the questions to be decided by this Court.  Accordingly, the Court will review each of the parties' claims under the appropriate standard, as set forth in the Administrative Procedure Act.  The specific issues to be addressed by this Court are (1) whether the Fourth Circuit's decision in <u>Moatz v. Goldstein</u>, 364 F.3d 205 (4th Cir. 2004), has any impact on the case presently before the Court; (2) whether the PTO has the authority to promulgate disciplinary rules and to impose the sanction of exclusion for conduct such as those found in this case; (3) whether the violations are supported by substantial evidence in the record and whether the PTO's interpretations of its disciplinary rules are reasonable; (4) whether there is evidence of bias or prejudgment amounting to a denial of the plaintiff's right to be adjudicated by a neutral decisionmaker; (5) whether the PTO violated the APA with respect to the separation of functions requirement and in dispensing with the notice requirement; (6) whether the administrative

---

[5] To the extent that the parties' statements of undisputed fact do not address the facts relating to the violations found in the GC Decision, the Court has reviewed the administrative record to determine what facts were presented to the PTO.

complaint was sufficiently specific to comply with the APA; and (7) whether the PTO or the ALJ committed significant procedural errors regarding the plaintiff's hearing and adjudication. Each issue will be discussed in turn.

### III.  Analysis

A.      Impact of the Fourth Circuit's Decision in <u>Moatz v. Goldstein</u>

Bender argues that "[a]s a matter of law, the GC Decision in this proceeding is void in view of a dispositive controlling decision handed down . . . in <u>Goldstein v. Moatz</u>, 364 F.3d 205 (4th Cir. 2004)." Pl.'s Mot. at 17. He contends that the <u>Goldstein</u> decision voids the GC Decision and compels this Court to grant his motion for summary judgement. Pl.'s Opp'n at 1-4. Bender also claims, more specifically, that under <u>Goldstein</u>, the RFI to which his answers were deemed evasive and thus in violation of 37 C.F.R. § 10.23(b)(5), constituted a request for improper discovery and that the charge of evasion therefore "cannot be supported by substantial evidence as a matter of law." Plaintiff's Opposition ("Pl.'s Opp'n") at 21-22. Further, Bender argues that the PTO acted in bad faith in "concealing" the <u>Goldstein</u> decision when issuing its Decision Upon Reconsideration ("DUR") by not mentioning or following the <u>Goldstein</u> decision. Pl's Mot. at 19-20. Finally, Bender argues that he did not waive the claim that the RFIs amounted to requests for improper discovery because (1) "he frequently contested the 'appropriateness' of the 'improper RFIs'" during the investigation and (2) <u>Goldstein</u> is an "intervening change in law" which permits him to advance the argument even if he failed to do so before the agency if the supervening decision has changed the law in his favor and the law was so well-settled at the time of trial that any attempt to challenge it would have appeared pointless. Pl.'s Opp'n at 2 (citing <u>United States v. Washington</u>, 12 F.3d 1128, 1139 (D.C. Cir. 1994)).

On the other hand, the PTO contends that <u>Goldstein v. Moatz</u> has no bearing on the instant case for several reasons.  First, the PTO argues that Bender waived his argument with respect to the impropriety of the RFIs and therefore cannot raise the argument at this time.  Def.'s Mem. at 20-21; Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply") at 1-3.  The PTO further asserts that it did not "conceal" the <u>Goldstein</u> opinion (to the extent that was possible), but rather did not cite the opinion because it was not relevant to its decision.  Def.'s Mem. at 21.  Second, the PTO argues that while <u>Goldstein</u> is characterized by the plaintiffs as a "dispositive controlling decision," as a Fourth Circuit decision it is not binding on this Court.  <u>Id.</u> at 22.  Third, the PTO argues that the <u>Goldstein</u> decision did not reach the questions of the constitutionality of RFIs and that its discussion concerning the authority of the PTO to issue RFIs was dictum.  <u>Id.</u> at 23-25.  Lastly, the PTO argues that even if <u>Goldstein</u> does hold that RFI's are unconstitutional, application of the exclusionary rule to the discovered information is inappropriate because the rule does not apply to administrative proceedings.  <u>Id.</u> at 27-29.

In <u>Goldstein</u>, the plaintiff was a patent attorney who was under investigation for misconduct and was directed by the PTO to respond to RFIs.  364 F.3d at 207-08. Goldstein then filed suit against several PTO officials in their individual capacities, seeking damages and declaratory relief in a <u>Bivens</u>[6] action arguing, <u>inter alia</u>, that the issuance of the RFIs violated his constitutional rights to free speech and due process.  <u>Id.</u> at 209-10.  The district court had held that the defendants were entitled to absolute immunity, and the issue on appeal to the Fourth Circuit was whether the district court's absolute immunity ruling was correct.  <u>Id.</u> at 210-11.  The Fourth Circuit reversed the district court's decision and found that the defendants were

---

[6] <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

not entitled to absolute immunity because they were performing investigative, as opposed to prosecutorial activities. Id. at 215. As a factor that supported denying the officials absolute immunity, the Goldstein Court noted that the process of requiring information through RFI's prior to the initiation of formal charges lacked any procedural safeguards. Id. at 217. The Court made this point because the "Supreme Court ha[d] indicated that, in assessing whether absolute immunity applies in a particular situation, [courts] should consider whether the system in question contains adequate procedural safeguards, such that private litigation is unnecessary to protect constitutional rights." Id. at 217 (citing Butz v. Economou, 438 U.S. 478, 512 (1978)). The Fourth Circuit concluded that Goldstein lacked the protection he would have been afforded by the formal discovery process, and it therefore remanded the case to the district court to determine whether the defendants were entitled to qualified immunity. Id. at 219.

Although the Fourth Circuit noted that the PTO's process of obtaining information through RFIs lacked any procedural protections, nowhere in the opinion did the court hold that the PTO did not have the authority to issue them. Rather, the Fourth Circuit's finding that the officials were not entitled to absolute immunity was based on the notion that attorneys must be provided procedural protections when RFIs are submitted to them. The Court found that "the only available limitation in this system is a private lawsuit; therefore, it is all the more important that the [d]efendants not be accorded absolute immunity." Id. at 219. In other words, the Goldstein Court recognized that patent attorneys needed procedural protection from coercive RFIs issued by the PTO, but it did not hold that the PTO lacks the authority to issue them. Lawyers may choose not to respond and seek redress by filing a lawsuit, or they may choose to respond to them. Goldstein therefore does not support the proposition which Bender urges, i.e., that the PTO lacks

the authority to issue RFIs prior to the initiation of an action under § 32.  Accordingly, the Court

declines to address any arguments advanced by the plaintiff that are based on the premise that the

PTO lacks such authority.

To the extent that Bender's arguments regarding the PTO's lack of authority to issue RFIs

are his own independent positions and are not based on his position that Goldstein is dispositive

or binding, the Court must first determine whether he is raising these arguments for the first time

on appeal from the GC Decision, and if so, whether they have therefore been waived.  The District

of Columbia has instructed that "[t]o preserve a legal or factual argument, we require its

proponent to have given the agency a 'fair opportunity' to entertain it in the administrative forum

before raising it in the judicial one."  Nuclear Energy Institute, Inc. v. Envtl. Prot. Agency, 373

F.3d 1251, 1290-1291 (D.C. Cir. 2004).  Thus, the general rule with respect to waiver is that

"claims not presented to the agency may not be made for the first time to a reviewing court."  Id.

at 1290 (quoting Omnipoint Corp. v. FCC, 78 F.3d 620, 535 (D.C. Cir. 1996)).

It is Bender's position that he did not waive his claim that coercive RFIs are, as a general

matter, improper.  Pl.'s Opp'n at 2.  In support of this position, he points to several instances in

which he challenged certain specific RFIs as improper.  Id.  In his response to the August 21, 1998

RFI, for example, Bender argued to the PTO that the RFI was "retaliatory," intended to "harass"

him, and "[sought] to injure invention marketing companies" and attorneys associated with such

companies.  Id. (citing response to RFI of August, 21, 1998).  In response to another RFI, Bender

made similar arguments, and also alleged that the RFI was essentially repetitive and an abuse of

process.  Id. (citing response to RFI of September 17, 1998).[7]  These and other objections must be

---

[7]  Bender references objections to four RFIs that were submitted to him.

considered in light of the fact that Bender responded to numerous other RFI's without objection. Indeed, as pointed out by the PTO in its Opposition, the ALJ questioned Bender about the duty of an attorney to respond to RFIs, asking him, "if the Patent Office sends you a letter and that letter is received by you and you do not make a response would that be . . . at least a technical violation of the duty that a patent attorney owes to the Patent and Trademark Office . . . .?"  Def.'s Reply at 2 (citing Administrative Hearing Transcript at 63-64.).  To this question, Bender replied:  "Yes. It's my opinion that no response would definitely be a violation . . . [b]ut I responded to every letter and there were many, many letters."  Id.  It therefore appears that while Bender objected to certain RFI's on specific grounds, he did not raise the objection that the mere issuance of RFIs to attorneys is improper, and that he agreed that as a general matter, patent attorneys had a duty to respond to them.

It therefore appears that Bender is raising his claim about the general impropriety of RFIs for the first time in his appeal to this Court.  Nevertheless, it is Bender's position that the claim was not waived because "it is well settled that an intervening change in law permits assertion of a non-pleaded defense on appeal, particularly when it would have been fruitless to do so below before the change in jurisprudence."  Pl.'s Opp'n at 2 (citing Washington, 12 F.3d at 1139).  Thus, because this argument relies on the Fourth Circuit's decision in Goldstein, and because, as explained above, Goldstein does not stand for the proposition that issuance of RFIs prior to the initiation of a § 32 action is beyond the PTO's authority, Bender's claim that Goldstein constitutes a supervening change in law must be rejected.  This Court therefore concludes that Bender waived his general challenge to the propriety of the PTO even issuing RFIs, and it therefore declines to

address the merits of this argument.[8]

B.      Does the PTO have the authority to promulgate disciplinary regulations and to impose the
        sanction of exclusion for the conduct found in this case?

        1.      The PTO's Statutory Authority to Discipline Attorneys

        Bender argues that the PTO lacks the statutory authority to discipline attorneys for conduct

such as that found in this case.  Pl.'s Mot. at 10; Pl.'s Opp'n at 11, 21.  He contends that the

regulations promulgated by the PTO with respect to the conduct and discipline of attorneys are

beyond the "federal objectives" of the PTO as set forth in 35 U.S.C. § 2(b)(2)(D) (2000).  Pl.'s

Mot. at 10; Pl.'s Opp'n at 11, 21. Specifically, Bender asserts that the term "before the Office" in

§ 2, restrict the PTO's authority to regulate the conduct of patent attorneys, and that the regulation

in this case exceeds that authority because the conduct at issue in this case does not constitute a

matter pending "before" the agency.  Pl.'s Mot. at 10; Pl.'s Opp'n at 11, 21.

        Where an agency is charged with implementing the statute at issue, the analysis in

Chevron, U.S.A. v. NRDC, 467 U.S. 837, 842-845 (1984) must be employed to determine

whether the agency's interpretation of the statute must be upheld.  The familiar two-step inquiry

set forth in Chevron is as follows:

        [courts] ask first whether 'Congress has directly spoken to the precise question at
        issue,'. . . if so . . . this court must give effect to Congress's 'unambiguously
        expressed intent.' If 'the statute is silent or ambiguous with respect to the specific
        issue,' [courts] ask whether the agency's position rests on a 'permissible
        construction of the statute.'

Sec'y of Labor, Mine Safety and Health Admin. v. Federal Mine Safety and Health Review

_____

        [8]  Even if there was no waiver, the information acquired from the plaintiff was properly considered by the
PTO because exclusion pursuant to the exclusionary rule is not an appropriate remedy in administrative proceedings.

Comm'n, 111 F.3d 913, 916 (D.C. Cir.1997) (citing Chevron, 467 U.S. at 843).  Where the text of

the statute is ambiguous, "the agency's interpretation of the statute is entitled to deference so long

as it is 'reasonable' and not otherwise 'arbitrary, capricious, or manifestly contrary to the statute.'"

Motion Picture Ass'n of America v. F.C.C., 309 F.3d 796, 801 (D.C. Cir. 2002) (citing Chevron,

467 U.S. at 843-44).

     35 U.S.C. § 2(b)(2)(D) states that the PTO

> may govern the recognition and conduct of agents, attorneys, or other persons
> representing applicants or other parties before the Office, and may require them,
> before being recognized as representatives of applicants or other persons, to show
> that they are of good moral character and reputation and are possessed of the
> necessary qualifications to render to applicants or other persons valuable service,
> advice, and assistance in the presentation or prosecution of their applications or
> other business before the Office.

35 U.S.C. § 2 (emphasis added).  Furthermore, 35 U.S.C. § 32 (2000) states, in relevant part, that:

> The Director [of the PTO] may, after notice and opportunity for a hearing, suspend
> or exclude, either generally or in any particular case, from further practice before
> the Patent and Trademark Office, any person, agent, or attorney shown to be
> incompetent or disreputable, or guilty of gross misconduct, or who does not
> comply with the regulations established under section 2(b)(2)(D) of this title, or
> who shall, by word, circular, letter, or advertising, with intent to defraud in any
> manner, deceive, mislead, or threaten any applicant or prospective applicant, or
> other person having immediate or prospective business before the Office.

32 U.S.C. § 32 (emphasis added).  Pursuant to this authority, the PTO promulgated regulations

governing the conduct of attorneys, several of which are implicated in this case.  See, e.g., 37

C.F.R. §§ 10.23, 10.62, 10.68, 10.77.  Accordingly, this Court must determine whether the PTO's

promulgation and enforcement of these regulations is within the authority granted to it by

Congress under the standard set forth in Chevron, 467 U.S. at 842-845.

     While it is clear from the language of 35 U.S.C. §§ 2 and 32 that Congress intended to

provide the PTO with the authority to regulate practitioners appearing "before the Office,"

including attorneys, what is not clear is the scope of this authority.  This authority can be

construed narrowly to include only those matters "directly involving a proceeding" before the

PTO.  Pl.'s Opp'n at 12.  Under this narrow reading, which is urged by Bender, a failure to

disclose a conflict of interest with respect to a particular patent application, for example, would

not qualify as being "before the Office."  Id. at 21.  On the other hand, helping a client to falsify a

patent application would qualify.  Id.  The language of the statute may also be read broadly, and

would thus include a wider range of conduct relating to representation of a patent applicant or a

potential patent applicant.  An analysis of the text of the statutes at issue here under Chevron, 467

U.S. at 842-45, supports the PTO's broader interpretation.

 In 35 U.S.C. § 2, Congress provides that the PTO may adopt regulations to ensure that

attorneys "render to applicants or other persons valuable service, advice, and assistance in the

presentation or prosecution of their applications or other business before the Office."  35 U.S.C. §

2 (emphasis added).  The language of § 2 is broad in its description of the individuals intended to

be covered by the provision, and in the scope of the type of representation it covers.  The language

in § 32 is also broad in its reach, providing for the suspension or exclusion of an attorney found to

have defrauded, deceived, mislead or threatened "any applicant or prospective applicant, or other

person having immediate or prospective business before the Office."  35 U.S.C. § 32 (emphasis

added).  The language of these provisions indicates that the phrase "before the Office" covers

even prospective applicants, and suggests that Congress intended the statute to create broad

authority.  Although the language in § 2 is vague as to the outer limits of the authority intended by

Congress, the second step of Chevron compels this Court to give substantial deference to the

PTO's interpretation and to uphold its interpretation of the statute in this case.  See Chevron, 467

U.S. at 842-45. Given the language of the statutes at issue, the PTO's interpretation is in no sense

"arbitrary, capricious, or manifestly contrary to the statute." Id. at 844.  In fact, it also appears that

the PTO's interpretation of the statutes seems far more realistic than the interpretation urged by

Bender due to the exceedingly narrow bounds of Bender's interpretation.  The Court therefore

concludes that the PTO did not exceed its statutory authority in prescribing and enforcing the

disciplinary rules the plaintiff is challenging.

    2.  Preemption of state law

    Bender cites the Supreme Court's decision in Sperry v. Florida, 373 U.S. 379, 402 (1963),

for the proposition that the PTO's ability to preempt state law is limited to its "federal objectives,"

which are strictly limited to the prosecution of patent applications before the PTO, does not

include matters that fall under the disciplinary authority of the state bars.  Pl.'s Mot at 11; Pl.'s

Opp'n at 13-14, 21.  While Sperry does hold that the PTO's authority to preempt state law is

limited to its federal objectives and that states retain control over matters they would normally

regulate, 373 U.S. at 402, Sperry does not hold that there is a "toggle" switch with respect to state

or federal authority to discipline attorneys.  The Federal Circuit made this point clear in Kroll v.

Finnerty, 242 F.3d 1359, 1365 (Fed. Cir. 2001), ruling that the PTO has broad authority to

discipline practitioners for misconduct.  In Kroll, the New York Attorney Grievance Committee

sought to discipline a patent attorney who was licensed in New York for conduct related to a

patent application.  Id.  The Federal Circuit explained that the Committee was not preempted from

acting.  Id. The Court did not indicate that only the state or the PTO has disciplinary authority, as

Bender suggests.  Id.; Pl.'s Mot. at 11.  Rather, Kroll concluded that the state and the PTO share

jurisdiction to discipline attorneys in cases where a violation of both PTO regulations and state

ethical rules are alleged.  Kroll at 1365.  Accordingly, the PTO's actions in this case do not

preempt state law in an impermissible manner, and Bender's contention to the contrary is

therefore without merit.

        3.        The sanction of exclusion

        Bender challenges the ALJ's decision to exclude him from the practice of law before the

PTO and the GC Decision which upheld the exclusion.  Pl.'s Opp'n at 41-46; Appeal Brief

Pursuant to 37 C.F.R. § 10.155 (2000) ("Appeal Brief") at 88-100.[9]  While he presents numerous

arguments as to why the sanction is not appropriate, this Court must adhere to the teachings of

Chevron, 467 U.S. at 842-845, and Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-414

(1945), and therefore must accord the PTO substantial deference with respect to its decision that

Bender's exclusion was reasonable under the applicable statutes and regulations.  Bender's main

argument is that 35 U.S.C. § 32 allows the agency to exclude him from practice only if he is

shown to be "incompetent or disreputable" or "guilty of gross misconduct."  Pl.'s Opp'n at 40;

Appeal Brief at 88.  The PTO responds, and this Court agrees with its position, that this is not a

correct reading of the statute.  35 U.S.C. § 32 provides that

> [t]he Director may, after notice and opportunity for a hearing, suspend or exclude,
> either generally or in any particular case, from further practice before the Patent
> and Trademark Office, any person, agent, or attorney shown to be incompetent or
> disreputable, or guilty of gross misconduct, or who does not comply with the

---

[9]  In his Motion for Summary Judgment and Memorandum of Points and Authorities in Support Thereof,
Bender primarily argues that the violations found by the PTO were not supported by substantial evidence, that the
PTO acted beyond its statutory authority, and that Goldstein v. Moatz requires the dismissal of this case.  However,
in his motion Bender incorporates by reference the arguments raised in his Appeal Brief before the PTO pursuant to
37 C.F.R. § 10.155 (2000), and his subsequent Request for Reconsideration filed pursuant to 37 C.F.R. § 10.156(c).
Pl.'s Mot. at 21.  Bender sets forth these arguments in his Opposition to the Defendant's Cross-Motion for Summary
Judgement.  Accordingly, this Court will address all arguments that have been raised by Bender.

regulations established under section 2(b)(2)(D) of this title . . . .

35 U.S.C. § 32 (emphasis added).  A plain reading of the statute permits an attorney who violates

§ 2(b)(2)(D), including Bender, to be excluded from practicing before the PTO.  This reading

clearly covers Bender because as the ALJ Decision correctly concluded, Congress has provided

the PTO with express statutory authority to bring cases such this one.  ALJ Decision at 5 (citing

Goldsmith v. U.S. Board of Tax Appeals, 270 U.S. 117, 122 (1926)).  And the sanction of

exclusion is not inappropriate because the ALJ did not provide a "reasoned discussion" of each of

the factors set forth in 37 C.F.R. § 10.154(b) (2001) as argued by Bender, Pl.'s Opp'n at 40,

because this Court is not free to disturb the PTO's decision of exclusion so long as it is

reasonable.  Bowles, 325 U.S. at 413-414.  As explained in the GC Decision, Bender's failure to

recognize that his conduct was improper, combined with his assertion that he would continue to

associate himself with invention promotion companies, warranted the sanction of exclusion to

prevent him from causing harm to future clients.  GC Decision at 44.  The GC Decision also

considered Bender's arguments that alleged improper conduct by the PTO amounted to

extenuating circumstances because it hampered his efforts in litigating the Daniels[10] case, as well

as case law cited by Bender to support his claim that exclusion from practice was excessive given

the facts.  Id. at 41-45.  The GC Decision provided an explanation for its rejection of Bender's

arguments and provided support for the sanction of exclusion.  Id.  Specifically, the GC Decision

explained that 35 U.S.C. § 32 does not require a showing of "incompetent or disreputable

conduct" or "gross misconduct" because the statute does not distinguish between the grounds for

---

[10]In re Daniels, 144 F.3d 1452 (Fed. Cir. 1998), was a case in which Bender succeeded in "having a large number of design applications revived, after they had been rejected by the PTO for including non-invented indicia in design applications."  ALJ Decision at 25 n.25.

suspension and exclusion. <u>Id.</u> at 40-41.

The GC Decision also explained that the alleged improper PTO conduct with respect to
Bender's litigation of the <u>Daniels</u> case did not preclude taking disciplinary action against Bender
because it was ultimately his choice to take such a large number of clients, and that it was
therefore Bender's actions and not the conduct of the PTO in reviewing the patent applications
that were at fault in this case. Pl.'s Opp'n at 41. Moreover, the sanction of exclusion was found
to be warranted because improper conduct by the PTO did not mitigate Bender's "failure to ensure
that continued prosecution of the application was in fact in the clients' best interests" and that
conflicts of interest on Bender's part remained, despite any action of the PTO. <u>Id.</u> at 41-42. The
GC Decision went on to note that while some violations found in the ALJ Decision were not
sustainable, "the core violations upon which the recommended remedy rests, and the only ones
specifically discussed in the penalty section of the [ALJ Decision]," namely, Bender's conflicts of
interest and failure to give adequate advice to his clients, "have been upheld." <u>Id.</u> at 42. The GC
Decision further explained that the reversal of the ALJ Decision's finding with respect to count 2
did not mitigate against exclusion because the counts that were upheld nevertheless supported the
sanction of exclusion. <u>Id.</u> The GC Decision also distinguished the cases cited by Bender to show
that the remedy in this case was unduly harsh, explaining that Bender's violations were more
serious than those in the cases he cited. <u>Id.</u> at 42-44. Finally, the GC Decision explained that
Bender's stated intent to continue representing clients associated with invention promotion
companies and his failure to recognize that his conduct was improper created the possibility that
he would again violate the rules and cause further harm to clients. <u>Id.</u> at 44. In light of the
explanation provided in the record, both in the ALJ Decision and the GC Decision, the sanction of

exclusion is in accordance with both 35 U.S.C. § 32 and 37 C.F.R. § 10.154(b).  Accordingly, the

Court has no basis to disturb the sanction of exclusion imposed by the PTO.

C.      Are the violations found by the PTO supported by substantial evidence and are the PTO's
        interpretations of its disciplinary regulations reasonable?

        Bender challenges the PTO's findings that his actions violated its disciplinary rules.  Pl.'s

Mot. at 15-17; Pl.'s Opp'n at 4-10, 14-20, 21-24  While the parties agree that the standard of

review is the "substantial evidence" standard, several of Bender's arguments challenge the PTO's

interpretation and application of its own disciplinary regulations, rather than the evidence

underlying the violations found by the PTO.  Pl.'s Mot. 15-17; Pl.'s Opp'n at 4-10, 14-20, 21-24.

And there is no question that with respect to the questioned interpretation and application of the

disciplinary regulations, the deferential standard set forth in Bowles, 325 U.S. at 413-414, and its

progeny applies in this case.  Under the APA, a reviewing court must set aside agency decisions

that are not supported by substantial evidence.  5 U.S.C. § 706(2)(A) (2000); Throckmorton v.

Nat'l Transp. Safety Bd., 963 F.2d 441, 444 (D.C. Cir. 1992).  The District of Columbia Circuit

has reiterated what the Supreme Court explained amounts to "substantial evidence" sufficient to

uphold an agency decision.  Morall v. Drug Enforcement Admin., 412 F.3d 165, 176 (D.C. Cir.

2005) (quoting N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299-300

(1939)).  Morall noted that "[s]ubstantial evidence 'means evidence which is substantial, that is,

affording a substantial basis of fact from which the fact in issue can be reasonably inferred.

[Thus,] [s]ubstantial evidence is more than a scintilla, and must do more than create a suspicion of

the existence of the fact to be established.'"  Id.  In reviewing a decision to determine whether it

was based on substantial evidence, "[t]he court's function is to determine only 'whether the

agency . . . could fairly and reasonably find the facts that it did.'"  Robinson v. Nat'l Transp.

Safety Bd., 28 F.3d 210, 215 (D.C. Cir.1994) (internal citations omitted).  Importantly, "an agency

decision 'may be supported by substantial evidence even though a plausible alternative

interpretation of the evidence would support a contrary view.'"  Morall, 412 F.3d at 176 (quoting

Robinson, 28 F.3d at 215).  However, while the substantial evidence standard is a deferential

standard of review, an agency decision must take contradictory evidence into account in making

its determination, and must "reflect attentive consideration" to the ALJ's decision.  Morall, 412

F.3d at 177.  In other words, an agency cannot simply ignore contradictory evidence or the

decision of an ALJ in making its final determination.  See, e.g., E. Tenn. Natural Gas Co. v.

F.E.R.C., 953 F.2d 675, 681 (D.C. Cir.1992).  Thus, in reviewing the agency's decision to assess

the presence of substantial evidence, the reviewing court must look to the administrative record.

Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp., 423 U.S. 326, 331 (1976) ("[T]he

focal point for judicial review should be the administrative record already in existence, not some

new record made initially in the reviewing court.") (citing Camp v. Pitts, 411 U.S. 138, 142

(1973)).

    With respect to an agency's interpretations of its own regulations, courts must give

substantial deference to what the agency has concluded.  Thomas Jefferson Univ. v. Shalala, 512

U.S. 504, 512 (1994).  The Supreme Court has explained that "[the courts'] task is not to decide

which among several competing interpretations best serves the regulatory purpose.  Rather, the

agency's interpretation must be given 'controlling weight unless it is plainly erroneous or

inconsistent with the regulation.'"  Id. (internal citations omitted) (quoting Bowles, 325 U.S. at

414); see also Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150-51

(1991) (courts should give effect to agency's interpretation as long as it is reasonable where the meaning of the statute is "not free from doubt."); Lyng v. Payne, 476 U.S. 926, 939 (1986) (courts must confer substantial deference to an agency's construction of its own regulations.); Udall v. Tallman, 380 U.S. 1, 16 (1965) (interpretation of a statute by agency charged with its administration generally is entitled to great deference.)

      1.      The neglect charges (neglect of entrusted matters)

With respect to the charge that Bender, in violation of 37 C.F.R. § 10.77(c),[11] neglected to notify several of his clients about the rejection of their patent applications in a timely manner, which then required the clients to pay an extension fee if they desired to appeal the rejection, Def.'s Mem. at 8,  Bender argues that both the ALJ Decision and the GC Decision failed to take into account why he delayed notifying his clients about the rejection of their patents.  Pl.'s Opp'n at 5-6.  Specifically, Bender argues that the timing of the letters was based on the pending decision in the Daniels case, and that his decision to delay notifying his clients was therefore not neglect, but rather a tactical decision on his part, designed to save his clients from paying unnecessary appeal fees.  Id.  Bender also argues that the PTO's failure to produce an expert witness to testify as to the meaning of the word "prompt" also resulted in erroneous holdings both in the ALJ Decision and the GC Decision on the issue of his alleged neglect.  Id. at 6.

In response, the PTO argues that whatever "tactical advantages" Bender's clients may have gained by delaying the filing of appeals, there is no adequate explanation for his failure to inform his clients of the situation in a timely manner, a decision which "simply deprived the client of the

---

[11]  37 C.F.R. § 10.77(c) states that "[a] practitioner shall not . . .[n]eglect a legal matter entrusted to the practitioner."

option to file within the three-month period and so avoid fees." Def.'s Mem. at 8-9 (citing GC

Decision at 26-27).  The PTO therefore argues that Bender's failure to provide timely notification

with respect to five clients is supported by substantial evidence.  Def.'s Mem. at 8-9.

       The GC Decision addressed these and other arguments made by Bender with respect to the

neglect charges.  GC Decision at 20-27.  The GC Decision based its conclusion that Bender

violated rule 10.77(c) on (1) his failure to advise his clients about the type of patent that should be

sought in letters he sent to them on this point, id. at 20-25, and (2) his failure to promptly notify

his clients of the final rejections of their applications.  Id. at 25-27.   The GC Decision provides an

explanation as to why Bender's justifications for his conduct are not sufficient, and refers to facts

in the record in support of its conclusion.  Id.  Specifically, the GC Decision explained that with

respect to Bender's failure to promptly notify his clients of the rejection of their design

applications (within the three-month period when the payment of a fee to appeal the decisions was

not required), his clients would have had more time to decide on a course of action and would

have avoided payment of the late filing surcharge.  Id.  The GC Decision found that Bender's

justification for the delayed notification of his clients was not plausible, because the action he

ultimately took (late notification) was inconsistent with his justification for why he did not notify

his clients earlier.  Id. at 26 (citing Appeal Brief at 31).  The GC Decision also concluded that

Bender could have notified his clients of the rejections with an explanation that options were

available to them, and was professionally obligated to do so.  Id. at 27.  Based on these

considerations, the GC Decision found that Bender did not provide an adequate explanation of the

reasons for his delay.  Id.  Accordingly, the PTO's decision did not ignore Bender's justifications

for his actions, but rather rejected them with specific and persuasive explanations as to why

Bender's justifications for his actions were not convincing.  The explanation in the GC Decision therefore meets the substantial evidence standard because it "could fairly and reasonably find the facts that it did," Morall, 412 F.3d at 176-77, namely, that Bender's explanations for his actions are not plausible.[12]  The controversy is therefore reduced to whether the undisputed time of notification was or was not "prompt."  Furthermore, to the extent that the PTO's decision is based on its interpretation of § 10.77(c), such as Bender's argument regarding the meaning of the term "prompt", the PTO's decision is consistent with language of the regulation.  Therefore, it must be upheld by this Court.  Thomas Jefferson Univ., 512 U.S. at 512.

2.  The conflicts of interest charges

Bender received substantial sums of money from AIC,  GC Decision at 27 (citing ALJ Decision at 23), and the ALJ Decision and GC Decision concluded that Bender should have recognized that his interests might diverge from those of his clients and that he was therefore required to inform them about the potential conflict of interests and to obtain his clients' informed consent to represent them.  ALJ Decision at 24; GC Decision at 31-32.  The ALJ found that Bender violated 37 C.F.R. § 10.62(a)[13] by accepting employment without disclosing that his professional judgment could be affected by his own financial interests.  GC Decision at 27.

Bender asserts that the conflicts of interest findings under 37 C.F.R. § 10.62(a) cannot be upheld because he viewed AIC as the agent of the inventors, whom he characterized as his clients,

_____

[12]  Importantly, there is no dispute as to when Bender notified his clients of the rejections.  GC Decision at 8 (citing ALJ Decision at 15-16, 30, 34, 36, 42).  The only dispute then is whether his delay in notifying his clients was neglectful, or whether it was justified.

[13]  37 C.F.R. § 10.62(a) states that "[e]xcept with the consent of a client after full disclosure, a practitioner shall not accept employment if the exercise of the practitioner's professional judgment on behalf of the client will be or reasonably may be affected by the practitioner's own financial, business, property, or personal interests."

and that his relationship with AIC was not the same as that of a client because he dealt with AIC at arms-length and collected legal fees only after his work was completed.  Pl.'s Opp'n at 14.  He further asserts that there was no proof of a "conflict" arising from his relationship with AIC based on the evidence adduced at the hearing and that an agent or intermediary acting on behalf of the client does not create a conflict per se, and that indeed, the PTO's own rules sanction such relationships.  Id. at 17.  He also contends that the PTO did not present any evidence that his relationship with AIC "would or reasonably might affect his professional judgment with respect to his representation of his client at the outset of his employment."  Id. at 18.

The PTO argues, on the other hand,  that there were, at the very least, interests that were potentially divergent because there was a 100% money-back guarantee to the clients if the patents were not issued, and further that Bender knew about this guarantee.  Def.'s Mem. at 11 (citing RX-31 at 3, 10).[14]  While the PTO acknowledges that a practitioner may represent a client where potential conflicts of interest are properly disclosed, the PTO contends that in this case, Bender failed to provide adequate disclosures because he did not explain the extent of his involvement with AIC, and did not address the money-back guarantee and the potential conflicts arising from AIC's addition of the non-invented features to the patent applications.  Id. at 12 (citing GC Decision at 31).  The PTO also contends that Bender violated 37 C.F.R. § 10.68(a)(1)[15] because full disclosure pursuant to the regulation requires disclosure as to the amount of the payments a

---

[14]  The parties utilize, as does the Court, the following references to the record:  Respondents' Exhibits are referred to as RX, and the PTO's exhibits are referred to as GX, with both references followed by Bates numbers.

[15]  37 C.F.R. § 10.68(a)(1) provides that "[e]xcept with the consent of the practitioner's client after full disclosure, a practitioner shall not . . .[a]ccept compensation from one other than the practitioner's client for the practitioner's legal services to or for the client."

24

practitioner receives from other sources, and that the record shows that Bender failed to do this. Def.'s Mem. at 13-14 (citing ALJ Decision at 15; GC Decision at 34-35).

The GC Decision addressed the very same arguments Bender makes here, and concluded that the conflict charges were amply supported by the evidence.  GC Decision at 27-33.  The GC Decision discusses with specificity the reasons supporting its conclusion that there were conflicts between Bender's interests and those of his clients, pointing to Bender's significant financial interests, the issue of whether AIC or the inventors were culpable for the added surface drawings, and the money-back guarantee.  Id. at  27-29.  The GC Decision also explained why, in the ALJ's view, there was no full disclosure as to the conflicts and lack of effective consent by the clients. Id. at 30-33.  These explanations sufficiently establish that there was substantial evidence in the record to uphold the ALJ's decision.  Furthermore, the GC Decision specifically addressed and rejected Bender's "arms-length" argument, the essence of which was that Bender was not dealing closely with AIC, but was representing his clients directly with AIC as their agent.  GC Decision at 33.  The record therefore establishes that there was sufficient evidence to conclude that Bender violated 37 C.F.R. § 10.62(a).

The GC Decision also explained why there was a finding of a lack of full disclosure pursuant to 37 C.F.R.§ 10.68(a)(1) with respect to Bender accepting funds from a source other than his clients.  GC Decision at 34 (citing ALJ Decision at 15 (citing Transcript at 231-233)). Specifically, the GC Decision explained that "full disclosure" within the meaning of the regulation includes disclosure of the amount of the payment received from a third party.  Id. at 34 (emphasis added).  This conclusion was based on the PTO's interpretation of its own regulation and must therefore be given substantial deference.  Thomas Jefferson Univ., 512 U.S. at 512.  And

25

the PTO's interpretation of the regulation is reasonable and is not "plainly erroneous or inconsistent with the regulation." Id. (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). Indeed, the regulation states that "[e]xcept with the consent of the practitioner's client after full disclosure, a practitioner shall not . . . [a]ccept compensation from one other than the practitioner's client for the practitioner's legal services to or for the client." 37 C.F.R. § 10.68(a)(1) (emphasis added). Therefore, Bender's argument that the rule was erroneously interpreted by the PTO must be rejected. As additional support for this Court's conclusion, the GC Decision also pointed to evidence discussed in the ALJ Decision that demonstrated that Bender failed to make full disclosure in accordance with the regulations. GC Decision at 34; ALJ Decision at 15 (noting that one of Bender's clients "was not apprised of the amount [he] was billing A.I.C. for his legal services."). Accordingly, the Court concludes that the evidence set forth in the ALJ Decision and the GC Decision with respect to Bender's conflicts of interest amounts to substantial evidence of this conclusion.

    3. The evasion charges

    The PTO found that Bender violated 37 C.F.R. § 10.23(b)(5) by allegedly "engaging in conduct prejudicial to the administration of justice, when he provided evasive answers to RFIs served upon him on September 18, 1998." Def.'s Mem. at 14 (citing ALJ Decision at 30-31; GC Decision at 35-36; GX-1 at 190). Bender argues that the evasion charge under 37 C.F.R. § 10.23(b)(5) was not supported by the record and that the answers he provided in response to the RFI were not evasive. Pl.'s Opp'n at 21-24. Further, he argues that the ALJ failed to explain how the answers were evasive. Id. at 23. He also argues that the administrative complaint did not specify the questions to which his answers were deemed evasive and that the finding itself was

based on the issuance of "improper" RFIs.[16]  Id. at 22-24.  On the other hand, the PTO argues that "[t]he ALJ's decision specifically addressed [Bender]'s evasion of several questions," identifying the relevant questions, and contends that Bender "could and should simply have stated that he did not make the disclosures which the [PTO] required, and, if he wished, explained why he did not believe they were legally required."  Def.'s Mem. at 14-15 (citing GX-1 at 193, 197-198, 212, 214-215).

37 C.F.R § 10.23(b)(5) provides, in part, that "[a] practitioner shall not . . . engage in conduct that is prejudicial to the administration of justice."  37 C.F.R § 10.23(b)(5).  Consequently, the GC Decision upheld the evasion finding only with respect to the September 18, 1998 RFI, as it was the only one specifically identified in the administrative complaint and "[o]nly with respect to Count 1 [did] the ALJ Decision make specific findings of evasion that clearly relate[d] to the charged conduct."  GC Decision at 35.  Specifically, the ALJ considered Bender's answers to several specific questions and determined those answers to be evasive.  Def.'s Mem. at 14-15; ALJ Decision at 30.  Moreover, the GC Decision, which discussed the finding of evasion alleged in Count 1, explain[ed] that the answers were evasive on their face and that the record therefore supported that finding.  GC Decision at 35.  In reaching this conclusion, the GC Decision rejected Bender's argument that there was no evidence in the record to support the charge.  Id.  Importantly, Bender did not explain how the answers were not evasive, and apparently did not do so at his hearing.  Based on the record, the finding of evasion was supported by substantial evidence.  The Court also finds that the specific discussion of the answers deemed

---

[16]  Bender's argument with respect to the RFIs was addressed in the section of this opinion that addresses the impact of the Goldstein decision on the RFIs at issue in this case.  See supra Section III.A., pp. 7-11.

to be evasive is sufficient to uphold the finding, given that the "evasive" nature of the answers is

apparent on their face, and the requirement that the agency's determination of what constitutes

evasion under § 10.23(b)(5) be accorded substantial deference.  <u>Bowles</u>, 325 U.S. at 414.

D.     Is there evidence in the record of bias or prejudgment amounting to a denial of the
       plaintiff's right to be adjudicated by a neutral decisionmaker?

       1.     Prejudgment and Institutional bias

       Bender contends that his case was prejudged, and points to the statements of certain PTO

officials as evidence that an "institutional bias" pervaded the PTO's investigation and

adjudication of his case.  Pl.'s Mot. at 4-5, 9; Pl.'s Opp'n at 24-26.  For one, he relies on the

statements of Michael Kirk, former Deputy Commissioner of Patents and Trademarks, made

during his testimony to the Senate Subcommittee on Regulation and Government Information in

1994.  <u>Id</u>; Pl.'s Stmt.¶ 12.  Specifically, Kirk made the following statements:

> [W]e have taken two individuals off the rolls and we have cases pending against
> four others . . . [;]it is a very small percentage [of the registered patent attorneys],
> but nonetheless bad apples create very bad situations . . . The ones that we are
> dealing with were working with the invention promotion companies . . .[b]ut []
> they are not properly representing their clients' interests.  They are working more
> for the invention development firm and so we have taken action against them to
> take them off the rolls.

<u>Id.</u>  Although Kirk did not mention him by name, Bender contends that he was one of the

attorneys being referenced by Kirk as "bad apples" for three reasons: (1) when the statement was

made, he was being investigated by the PTO; (2) the facts involving the attorneys mentioned were

the same as those in his case, that is, situations where drawings had been added to design

applications; and (3) information he has about three other attorneys who were excluded from

practice logically leads to the conclusion that he was the fourth attorney Kirk mentioned.  Pl.'s

Opp'n at 26.  He also points to the statement of Q. Todd Dickinson, a former Commissioner of

Patents and Trademarks, who stated that invention promotion companies are like "weeds" or

"cockroaches" and need to be "more aggressively stamped out."  Pl.'s Mot. at 9.  Bender contends

that these statements reveal an "institutional bias" against any attorney affiliated with an invention

promotion company, and thus an institutional bias with respect to him personally, making it

impossible for him to receive a fair adjudication.  Pl.'s Opp'n at 24-26.

      The PTO responds that Bender's theory regarding the PTO's animus against invention

promotion companies and consequently against him are merely "speculative allegations."  Def.'s

Mem. at 15.  The PTO notes that the officials Bender identified never referred to the situation

involved in this case or mentioned him by name.  Id.  In addition, the PTO contends that Bender

fails to cite any record evidence in support of his theory or even to allege that the theory would

form a basis for overturning the PTO's decision, even if true.  Id. at 16.

      Where a violation of due process resulting from bias is alleged, the complaining party

bears the burden of showing "a risk of actual bias or prejudgment" and must "overcome the

presumption of honesty and integrity in those serving as adjudicators."  Withrow v. Larkin, 421

U.S. 35, 47 (1975).  The Supreme Court has held that earlier statements about a position on an

issue of law or policy is not a sufficient basis to disqualify a decisionmaker.  See, e.g., Hortonville

Joint Sch. Dist. No. 1 v. Hortonville Educ. Assn., 426 U.S. 482, 493 (1976) ("Mere familiarity

with the facts of a case gained by an agency in the performance of its statutory role does not,

however, disqualify a decisionmaker.  Nor is a decisionmaker disqualified simply because he has

taken a position, even in public, on a policy issue related to the dispute . . . ."); Laird v. Tatum,

409 U.S. 824, 831-838 (1972); Fed. Trade Comm'n v. Cement Inst., 333 U.S. 683, 700 (1948).  In

order to prevail on the claim that he was denied due process because the decision maker was

biased, Bender must show that the "decision maker [was] 'not capable of judging a particular

controversy fairly on the basis of its own circumstances.'" NEC Corp. v. United States, 151 F.3d

1361, 1373 (Fed. Cir. 1998) (quoting Hortonville, 426 U.S. at 493) (internal quotations omitted),

cert. denied, 525 U.S. 1139 (1999).  This standard can be met, for example, by showing that "the

decision maker's mind is 'irrevocably closed . . . .'" Id. (quoting Cement Inst., 333 U.S. at 701).

In Cement Institute, prior to the filing of a complaint by the Federal Trade Commission

("FTC" or "Commission") against, inter alia, cement industry businesses, alleging antitrust

violations, the Commission, or some of its members, had concluded that the system used in the

industry amounted to a restraint of trade in violation federal antitrust legislation.  Id. at 687, 700-

01.  In ruling on whether the Commission should have granted the industry's request that the

Commission disqualify itself, the Supreme Court assumed that "an opinion [on the issues under

consideration] had been formed by the entire membership of the Commission . . ." Id. at 700.

Nonetheless, the Court rejected the argument that the Commission had prejudged the issues or

was biased.  Id. at 700-701.  The Court concluded:

> the fact that the Commission had entertained such views as a result of its prior ex
> parte investigations did not necessarily mean that the minds of the members were
> irrevocably closed on the subject of the respondents' basing point practices. . . .
> [The members of the industry] produced evidence--volumes of it. They were free
> to point out to the Commission by testimony, by cross-examination of witnesses,
> and by arguments, conditions of the trade practices under attack which they
> thought kept these practices within the range of legally permissible business activities.

Id. at 701.  Similarly, in Keating v. Office of Thrift Supervision, 45 F.3d 322 (9th Cir. 1995), the

Director of the Office of Thrift Supervision had made statements which indicated that he had

prejudged the facts of a case that was before the agency.  Id. at 327.  But, the Ninth Circuit held

that these statements, along with other factors, did not result in an unfair decision because the agency head resigned before the ALJ issued his decision, and the final order was also issued by another official.  Id.  While finding the former Director's comments troubling, the Keating Court determined that his role in the ultimate decision was minor, and that the agency therefore did not violate the neutral decisionmaker requirement.  Id.  On the other hand, in Cinderella Career and Finishing Sch., Inc. v. FTC, 425 F.2d 583 (D.C. Cir. 1970), the Circuit Court for this Circuit held that FTC committed a due process violation because its Chairman made statements that indicated prejudgment of both the law and the facts of a particular case while the appeal from a hearing examiner's decision the Examiner's case was pending before him.  Id. at 589-91.

Here, the facts of this case do not rise to a level that would warrant a finding that there was prejudgment or institutional bias against Bender.  Like the agency decisions in Keating, the initial and final decisions here were not those of the individual who made the comments at issue. Keating, 45 F.3d at 327.  The individuals in this case had left the PTO prior to the issuance of the GC Decision, and the actual decision makers (the ALJ and Toupin) did not personally make any statements that would indicate bias.  Thus, this case is distinguishable from Cinderella on this crucial point because there, the biased statements were made by the decision maker, who at the time had the case pending before him.  Cinderella, 425 F.2d at 589.  Furthermore, Cinderella involved statements made in a public speech, which the Court found different than a pre-decision press release that expresses concern about the activities of a party.  Id. at 590.  The comments at issue in this case were general in nature and reflected opinions essentially related to a policy position.  See Cement Inst., 333 U.S. at 700.  In any event, to the extent the statements made by Kirk and Dickinson pertain to the facts of Bender's case, they are exceedingly vague and do not

31

identify Bender by name, and Bender's contention that the statements were specifically directed at him is highly conjectural.  Moreover, they do not provide an adequate basis for this Court to conclude that the agency as a whole prejudged the facts of his particular case, and thereby, failed to provide him with a neutral decision maker.  Under these circumstances, the Court concludes that Bender has not provided proof of prejudgment or institutional bias sufficient to show a violation of the neutral decision maker requirement.  Keating, 45 F.3d 322 at 327.

Bender also alleges that the Committee on Discipline was tainted because one of its members (Rolla) knew that the PTO had a policy which was hostile to invention promotion companies and that Bender was affiliated with such a company.  Pl.'s Opp'n at 30; Appeal Brief at 79.  The Court rejects this argument because Bender has failed to offer any proof that this was indeed the case, and thus has not established "a risk of actual bias or prejudgment," which is necessary to "overcome[] [the] presumption of honesty and integrity in those serving as adjudicators . . . ." Withrow, 421 U.S. at  47.  Indeed, Bender himself acknowledges that this argument is based on speculation.  Pl.'s Opp'n at 30 ("Even though Mr. Rolla's vote was not necessary for a majority, there is no way to know whereby his influence upon the others can be quantitatively measured.").  Accordingly, Bender has failed to show either prejudgment or institutional bias.

2.      Was there bias on the part of the ALJ?

Bender further argues that the ALJ was biased because during his hearing the ALJ made remarks that Bender characterizes as "intemperate" and  "hostile."   Pl.'s Opp'n at 35; see also Appeal Brief 102-109.  He also argues that the ALJ "mischaracterized" or "belittled" his evidence.  Pl.'s Opp'n at 36.  He further contends that the ALJ's "sua sponte" conclusions with

respect to certain findings of fact and law are not supported by evidence. Id. at 36-37.[17]  In

response, the PTO argues that there is no indication of bias on the part of the ALJ, and that his

unfavorable statements about Bender constitute "reasonable inferences from the record."  Reply in

Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply.") at 21.

Furthermore, the PTO argues that there is no evidence in the record of "deep-seated favoritism or

antagonism" against Bender by the ALJ.  Id. (citing Liteky v. U.S, 510 U.S. 540, 555 (1994)).

　　　　Bias on the part of a decision maker sufficient for disqualification is difficult to prove.  As

the Supreme Court has stated:

> opinions formed by the judge on the basis of facts introduced or events occurring
> in the course of the current proceedings, or of prior proceedings, do not constitute a
> basis for a bias or partiality motion unless they display a deep-seated favoritism or
> antagonism that would make fair judgment impossible. Thus, judicial remarks
> during the course of a trial that are critical or disapproving of, or even hostile to,
> counsel, the parties, or their cases, ordinarily do not support a bias or partiality
> challenge.

Liteky, 510 U.S. at 555.  The Liteky Court cited Berger v. United States, 255 U.S. 22 (1921), a

German espionage case from World War I where the Judge stated that "'[o]ne must have a very

judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts

are reeking with disloyalty[,]'" as an example of impermissible bias, i.e., "such a high degree of

antagonism as to make fair judgment impossible."  Liteky, 510 U.S. at 555 (quoting Berger, 255

U.S. at 28).  On the other hand, the Court noted that "expressions of impatience, dissatisfaction,

annoyance, and even anger, that are within the bounds of what imperfect men and women . . .

sometimes display" are not sufficient to show impermissible bias.  Id. at 555-56.  Thus, the Court

---

[17]  For the reasons explained above, the findings of the ALJ on the charges upheld in the GC Decision are
supported by substantial evidence and this Court therefore declines to address in this section of the opinion Bender's
argument that there was not substantial evidence in the record to support the ALJ's conclusions.

explained that only rarely will remarks by the adjudicator rise to the level of impermissible bias. Id. at 555.  Furthermore, the Liteky Court explained that bias should not be imputed to a judge where the judge declines to find all or most of the evidence put forth by a party credible.  Id. Indeed, as the Supreme Court has noted, "in the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next.  Accordingly, total rejection of an opposed view cannot of itself impugn the integrity of competence of a trier of fact."  N.L.R.B. v. Pittsburgh S.S. Co., 337 U.S. 656, 659 (1949).  Thus, the District of Columbia Circuit explained, "[a] trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias.  Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest."  S. Pac. Commc'ns Co. v. Am. Tel. and Tel. Co., 740 F.2d 980, 995 (D.C. Cir.  1984).  And the Circuit Court has applied the Liteky standard to ALJs in the administrative hearing context.  See e.g., Pioneer Hotel, Inc. v. N.L.R.B., 182 F.3d 939, 944 (D.C. Cir. 1999).

Here, none of the ALJ's remarks identified by Bender reveal bias which "display a deep-seated favoritism or antagonism that would make fair judgment impossible."  Liteky, 510 U.S. at 555.  While some of the remarks do evidence a frustration with Bender and a sense that his positions and evidence lack credibility, both the Supreme Court and the District of Columbia Circuit have made it clear that a judge who forms views or opinions within the context of the hearing, including those causing frustration or hostility toward one of the parties, do not exhibit disqualifying bias.  Liteky, 510 U.S. at 555; Pittsburgh S.S. Co., 337 U.S. at 658; S. Pac. Commc'ns Co., 740 F.2d at 995.  Accordingly, Bender has failed to show that the ALJ was

impermissibly biased against him.

E.      Did the PTO violate the APA by failing to provide Bender with written notice of the
        disciplinary violations and the opportunity to demonstrate or achieve compliance with its
        disciplinary regulations before initiating the disciplinary proceedings?

Bender next argues that the PTO violated § 558(c) of the APA, 5 U.S.C. § 558(c) (2005),

by failing to (1) give him notice of the facts or conduct which may result in disbarment and (2) the

opportunity to show that he had complied or to bring himself into compliance with the regulations

he was found to have violated.  Pl.'s Opp'n at 27-29; Motion for Reconsideration pursuant to 37

C.F.R. § 10.156(c) ("Mot. for Recon.") at 7-10.  In essence, Bender argues that the decision of the

PTO to bring the case against him was subject to the requirements of § 558(c) of the APA, and

therefore, he did not receive the required notice and opportunity to demonstrate compliance, or to

bring himself into compliance, as called for by the APA.  Pl.'s Opp'n at 27-28.  Further, Bender

argues that if PTO deemed these requirements unnecessary, such a determination under § 558(c)

could be made only upon a finding of either willfulness or the need to act in the public interest,

and that an "adjudication" of this nature was not made before the disciplinary proceedings against

him were initiated.  Id.  The precise question raised by Bender is therefore whether the PTO's

decision to initiate disciplinary proceedings against him had to be preceded by compliance with

the requirements of § 558(c).

The PTO argues that its decisions made prior to the ALJ hearing, such as the decision to

bring the administrative proceeding against Bender, "are not subject to the APA's judicial review

provisions."  Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s

Rep.") at 16.  The PTO contends that "§ 558(c) does not, by its terms, require any proceeding

whatsoever to determine whether its notice and opportunity requirements apply in a particular

case" because the decision does not constitute an "agency proceeding." Id. at 16-17.

Section 558(c) of the APA states that "[e]xcept in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given – (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements." 5 U.S.C. § 558(c) (emphasis added).  "Willfulness" under § 558(c) has been defined as "an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof." Capitol Packing v. United States, 350 F.2d 67, 78-79 (10th Cir.1965).  In addition, a violation has been deemed willful if  "the violator '(1) intentionally does an act which is prohibited, – irrespective of evil motive or reliance on erroneous advice, or (2) acts with careless disregard of statutory requirements . . . .'" Potato Sales Co., Inc. v. Dep't of Agric., 92 F.3d 800, 805 (9th Cir.1996) (quoting Lawrence v. Commodity Futures Trading Comm'n, 759 F.2d 767, 773 (9th Cir.1985)).  The District of Columbia Circuit has held that a formal determination as to willfulness is not required prior to bringing a complaint.  Finer Foods Sales Co., Inc. v. Block, 708 F.2d 774, 778 (D.C. Cir. 1983) ("The petitioner argue[d], however, that the Secretary's action was impermissible because, prior to instituting the disciplinary proceeding, he did not make a formal determination of willfulness.  Nothing in the Administrative Procedure Act imposes that requirement or supports the petitioner's apparent contention that the determination of willfulness itself may be made only after a hearing.").  Rather, an officer making a determination of willfulness must know the "extent and character of the violations, [so as to provide] an adequate basis for making that determination." Id.

36

Finer Foods dealt with the issue of what is required for a finding of willfulness sufficient to dispense with the APA's "opportunity to demonstrate or achieve compliance . . . requirements." Id. at 777.  There, the petitioner was "a licensee under the Perishable Agricultural Commodities, 7 U.S.C. §§ 499a-499s . . . ," id. at 776, who was found to have failed to pay for agricultural goods acquired in 24 transactions in violation of that Act.  Id. at 777.  The petitioner did not dispute that the payments had not been made, but argued that the Secretary of Agriculture's decision that Finder Food's conduct amounted to "flagrant and repeated violations," id., "was impermissible because, prior to instituting the disciplinary proceeding, he did not make a formal determination of willfulness."  Id. at 778.  The District of Columbia Circuit rejected the petitioner's argument, finding that "[n]othing in the [APA] imposes that requirement or supports the . . . contention that the determination of willfulness itself may be made only after a hearing;" that "[i]f . . . the violations were willful, the requirement . . . of opportunity for correction of the violations is inapplicable;" that "[w]hen the Secretary instituted the disciplinary proceeding without first giving [Finer Foods] the opportunity to cure the violation, necessarily he determined that the violations were willful;" and, that "[s]ince at that time [the Secretary] already knew the extent and character of the violations, he had an adequate basis for making that determination."  Id.

Here, Bender's argument with respect to willfulness must be rejected under the law of this Circuit.  First, there was no requirement that an adjudication of willfulness be made prior to the institution of the disciplinary proceedings.  Second, in any event, Bender's conduct, which was found to constitute neglect, failure to disclose conflicting financial interests and evasion in violation of the PTO's regulations can properly be classified as "willful" conduct as defined and found in Finer Foods.  Lastly, the Director of the OED had knowledge as to both the extent and

character of Bender's violations, and therefore had an adequate basis to conclude that Bender's conduct was willful and thus dispense with the APA's notice and opportunity to demonstrate or achieve compliance requirements before disciplinary proceedings were initiated.

F.      Did the PTO violate the APA's separation of functions requirement?

Bender argues that the PTO violated the separation of functions requirement, as mandated in 5 U.S.C. § 554(d), by allowing Harry Moatz to investigate the allegations against him, and then to also permit Moatz to participate in the deliberations of the Disciplinary Committee that decided to bring the administrative complaint against him, as well as allowing him to then prosecute Bender at the ALJ hearing.  Pl.'s Opp'n at 29; Appeal Brief at 77-78.  The PTO responds that the determinations and processes in which Moatz participated were not subject to the proscription of § 554(d).  Def.'s Rep. at 17-18.

Section 554(d) of the APA states that

> [a]n employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings.

5 U.S.C. § 554(d).  Further, the relevant PTO regulation provides that

> [t]he Committee on Discipline shall meet at the request of the Director and after reviewing evidence presented by the Director shall, by majority vote, determine whether there is probable cause to bring charges under § 10.132 against a practitioner. When charges are brought against a practitioner, no member of the Committee on Discipline, employee under the direction of the Director, or associate solicitor or assistant solicitor in the Office of the Solicitor shall participate in rendering a decision on the charges.

37 C.F.R. § 10.4(b) (2000).  The question, then, is whether the decision of the Committee to bring

charges against Bender is an "agency review pursuant to section 557" of the APA.  5 U.S.C. §

554(d).  Bender contends that the Disciplinary Committee decision is an "'adjudication' within

the meaning of the APA because it triggers a proceeding under § 32 of the patent statute."  Pl.

Opp'n at 29.  This argument is unpersuasive.  37 C.F.R. § 10.4(b) does not provide that the

Disciplinary Committee's decision to bring a complaint is an "adjudication" under § 557 of the

APA.  The APA defines an adjudication as an "agency process for the formulation of an order."  5

U.S.C. § 551(7).  An order is defined in the APA as "the whole or a part of a final disposition,

whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other

than rule making but including licensing." 5 U.S.C. § 551(6).  The decision to bring a complaint

in no way constitutes part of a final disposition, and therefore is not an adjudication.  Furthermore,

Bender's argument fails because an agency's interpretations of its own regulations are entitled to

substantial deference, and the PTO's decision in this case to allow Moatz to proceed under §

10.4(b) is reasonable and must be upheld.  See, e.g. Thomas Jefferson Univ., 512 U.S. at 512.

With respect to Moatz's subsequent prosecution of Bender, there was likewise no violation of the

separation of functions requirement, as prosecution of a matter does not constitute "participation"

in the final decision, which is what is prohibited by the APA.

G.     Was the administrative complaint sufficiently specific to comply with the APA?

        Bender makes several arguments with respect to the complaint that initiated the

administrative case against him.  Pl.'s Opp'n at 30-31; Appeal Brief at 75-77.  He argues that the

administrative complaint "fail[ed] to give adequate notice of the grounds of alleged misconduct"

because it lists "averments" and "disciplinary rules" separately, and does not provide a "linkage"

between the two sections.  Pl.'s Opp'n at 31.  This structure, argues Bender, makes the

administrative complaint "incoherent and confusing" and thus failed to provide fair notice. Id. In addition to these general arguments about the alleged deficiency of the complaint, Bender also makes arguments specific to the individually charged violations.

Specifically, with respect to the claims pertaining to neglect under 37 C.F.R. § 10.77(c), Bender argues that the complaint fails to comport with the APA because: (1) the allegations regarding Bender's failure to discuss the appropriateness of the pending patent's design application with his client are not linked with a particular rule, making it hard for him to determine whether the allegation related to neglect or some other charge, such as misrepresentation; and (2) that the allegation in the complaint stating that Bender failed to act with sufficient promptness in informing his clients about the status of their patent applications is similarly defective because it is not tied to any specific rule violation identified in the complaint. Pl.'s Opp'n at 10-11. Additionally, with respect to the charges made under 37 C.F.R. §§ 10.62(a) and 10.68(a)(1), Bender argues that the complaint does not set forth the charges with sufficient particularity. Pl.'s Opp'n at 20. Specifically, he contends that the factual allegations that formed the basis for the alleged violations of these regulations are set forth "in a conclusory manner without any particularization . . . ." Id. Accordingly, Bender claims that these allegations are "non-specific, vague and ambiguous . . ." and failed to "sufficiently inform [him] before the [h]earing of a conflict of interest under the rule, let alone what are the alleged diverging conflicting interest." Id.

The PTO argues, in response, that Bender was adequately informed by the complaint of each of the charges lodged against him. Def.'s Rep. at 7-8. Furthermore, the PTO contends that the complaint was sufficient to allow Bender to prepare a defense, and that he was not misled by

the complaint.  Id.  It is therefore the PTO's position that the complaint was sufficient and

contained all that was required pursuant to 5 U.S.C. 37 § 554(b) (2000) and 37 C.F.R. § 10.134

(2000).  Id.  Def.'s Rep. at 7-8.  Moreover, posits the defendant, the complaint specifically states

the charges that were made against Bender, and separately identified the facts on which those

charges are based.  See Admin. Compl.

The required content of an administrative complaint is set forth in § 554(b) of the APA.  5

U.S.C. § 554(b).  This section provides that "[p]ersons entitled to notice of an agency hearing

shall be timely informed of – (1) the time, place, and nature of the hearing; (2) the legal authority

and jurisdiction under which the hearing is to be held; and (3) the matters of fact and law

asserted."  Id.  The Court notes that the language used by Congress in subsection three of §

554(b), while specific in its directive that matters of law and fact must be set forth in the notice,

provides no guidance about how matters of fact and law must be asserted.  As explained

elsewhere in this opinion, an agency regulation which construes this directive is entitled to

substantial deference as to its interpretation under Chevron, 467 U.S. at 842-845.  And, the PTO

has adopted a regulation (37 C.F.R. § 10.134), which governs the content of its administrative

complaints.  The regulation provides that the complaints filed by the PTO must "[g]ive a plain and

concise description of the alleged violations of the Disciplinary Rules by the practitioner."  37

C.F.R. § 10.134(a)(2).  And this regulation does not on its face conflict with § 554(b) of the APA.

The National Labor Relations Board ("NLRB") regulation which governs complaints filed

by the NLRB[18] is similar to the PTO regulation.  Thus, the District of Columbia Circuit's cases

---

[18]  29 C.F.R. § 102.15 (2005) provides, in relevant part, that "[t]he complaint shall contain: (a) A clear and
concise statement of the facts upon which assertion of jurisdiction by the Board is predicated, and (b) A clear and
concise description of the acts which are claimed to constitute unfair labor practices, where known, the approximate

addressing complaints filed by the NLRB provide guidance with respect to what must be provided

in a complaint issued by the PTO and under what circumstances a complaint may be insufficient.

In NLRB v. Blake Const. Co., 663 F.2d 272 (D.C. Cir. 1998), the Court of Appeals held that

"[t]he Board may not make findings or order remedies on violations not charged in the General

Counsel's complaint or litigated in the subsequent hearing." Id. at 279; see also Gen. Teamsters

and Allied Workers Local Union No., 992 v. N.L.R.B., 427 F.2d 582, 588 (D.C. Cir. 1970). Thus,

the NLRB's "own rules require that the complaint inform . . .[the other party] of the violation

asserted." Id. (footnote omitted).  Therefore, an administrative complaint must, at a minimum, set

forth the charged violations and the facts on which those violations are founded so that the

charged party may adequately prepare and present a defense.  Blake Const. Co., 633 F.2d at 283.

Although, in some instances, the PTO did not specifically correlate the factual allegations

with the regulation violations charged in its complaint, this Court finds that the complaint was

sufficient to provide Bender with sufficient notice of the charged conduct.  As explained above,

the APA requires only that the matters of law and fact be asserted in the complaint, and the PTO

has done this.  The PTO has also reasonably interpreted what its own regulation requires be

contained in its complaints and substantial deference must be accorded to that interpretation.  And

all of the violations which Bender was ultimately found to have committed were sufficiently

designated in the complaint (or the violations found by the ALJ were reversed by the GC Decision

for a failure to do so), as both the underlying factual conduct and the regulations allegedly violated

were asserted, consistent with what the Court required in Blake Const. Co., 663 F.2d at 279, and

---

dates and places of such acts and the names of respondent's agents or other representatives by whom committed."

General Teamsters, 427 F.2d at 588.  Accordingly, this Court finds that the additional step of specifically identifying which particular facts correspond with the particular disciplinary regulation charged in the complaint is simply not required by Congress or the law of this Circuit where it is ascertainable, as here, which facts pertain to which charges.  Therefore, Bender's challenge to the sufficiency of the complaint must be rejected.

H.     Did the PTO or the ALJ commit significant procedural errors bearing on the plaintiff's hearing and the adjudication?

1.     Failure to permit discovery

Bender argues that the ALJ's pre-hearing decision not to allow him to take the testimony of certain PTO employees "adversely affected [his] ability to put on an effective defense thereby denying him a full and fair [h]earing."  Pl.'s Opp at 33; Appeal Brief at 80-83.  It is Bender's contention that if he had been allowed to take testimony from these individuals, he would have been able to present "exculpatory evidence" about, inter alia, improper agency conduct as to various aspects of his case (some which are discussed elsewhere in this opinion), improper agency motives, and institutional as well as individual bias.  Pl.'s Opp'n at 33-34.

The PTO contends, as a preliminary matter, that the PTO's rejection of certain patent applications is "hardly germane to [the p]laintiff's duty to notify his clients."  Def.'s Reply at 19-20.  Furthermore, the PTO argues that Bender's contention that such discovery would show "unclean hands" on the part of the PTO would not show bias on the part of the ALJ.  Id. at 20.

With respect to discovery in agency proceedings, the District of Columbia Circuit has explained that

[t]he extent of discovery that a party engaged in an administrative hearing is

entitled to is primarily determined by the particular agency: both the Federal Rules
of Civil Procedure and the Federal Rules of Criminal Procedure are inapplicable
and the Administrative Procedure Act fails to provide expressly for discovery;
further, courts have consistently held that agencies need not observe all the rules
and formalities applicable to courtroom proceedings.

McClelland v. Andrus, 606 F.2d 1278, 1285 (D.C. Cir. 1979) (citations omitted) (footnotes

omitted).  37 C.F.R. § 10.152(B) states that "[d]iscovery shall not be authorized . . . of any matter

which: (1) will be used by another party solely for impeachment or cross-examination."  In

seeking the testimony of the three PTO employees, Bender's very purpose was to illicit

admissions that the PTO's investigation and complaint against him, in which these employees

participated or were involved, was unfair and flawed on multiple levels.  Pl.'s Opp'n at 33 Appeal

Brief at 80-83.  Therefore, the discovery sought by Bender was reasonably construed as designed

to develop "impeachment or cross-examination" material, and according deference to the agency's

interpretations of its own regulations the Court declines to disturb the agency's decision.

Accordingly, the Court does not agree that the ALJ's denial of discovery was improper.[19]

2.       The ALJ's failure to dismiss counts of the administrative complaint

Bender argues that the ALJ erred by denying his motion to dismiss eight of the ten counts

filed against him because "the PTO did not produce the inventors named in the Counts as

witnesses at the hearing even though it owned the burden of proof." Appeal Brief at 53-54; Pl.'s

Opp'n at 35.  Bender argues that the failure to produce the inventors' names was a violation of §

---

[19]   The Court also declines to hold that the ALJ improperly denied Bender's request for discovery of the
disciplinary files of other PTO practitioners.  Pl.'s Opp'n at 35.  Bender contends that these files might show that the
PTO wrongly assumes that association with AIC is considered a per se violation of the disciplinary rules.  Id.  This
argument is purely speculative and is not highly relevant to the real issue in this case, i.e., whether Bender's own
actions violated the PTO's regulations, and proof that he did is supported by substantial evidence in the
administrative record.

556(d) of the APA, 5 U.S.C. § 556(d),[20] because "he was deprived of an opportunity to cross-examine these witnesses."  Id.   And, Bender contends that "the remaining witnesses were incompetent to testify probatively about any of the adopted charges with respect to the eight other counts."  Id.  In response, the PTO asserts that because Bender "has not alleged that he was in any way prevented from calling the inventors as witnesses and examining them on any issue relevant to the matter," he was not denied a "full and fair" hearing.  Def.'s Reply. at 20 (quoting Ritz v. O'Donnell, 566 F.2d 731, 736 (D.C. Cir. 1977)).

The PTO is correct that there is nothing in the record which indicates that Bender was prevented from calling his own witnesses with respect to the charges he claims should have been dismissed, and he was therefore not precluded from "present[ing] his defense by oral . . . evidence," as required by the APA.  5 U.S.C. § 556(d).  Neither was he prevented from "submit[ing] rebuttal evidence" in the form of testimony by witnesses he desired to call, as he must be afforded the opportunity to do under § 556(d).  Bender's argument implies that the PTO was required to present as witnesses the investors with respect to each charge so that he could cross-examine them, and that without such witnesses the PTO could not support the charges filed against him.  The Court must reject this argument.  As explained in the GC Decision, the ALJ's determinations were based on "documents prepared in the course of [Bender's] representation of his clients" and were "for the most part, direct evidence of [Bender's] actions in the course of his representation of the pertinent clients".  GC Decision at 19.

As previously noted, the violations found by the ALJ are supported by substantial record

---

[20]5 U.S.C. § 556(d), provides in pertinent part that "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

evidence.  And, in such circumstances, there is simply no requirement that the PTO call witnesses

to testify as to each count of the complaint in order for them to be cross-examined by Bender.

That Bender himself was not prevented from calling such witnesses adds additional support for

this conclusion.  Ritz, 566 F.2d at 736.  Accordingly, Bender's argument must be rejected.

     3.       Appointment of the ALJ

Bender contends that the appointment of the ALJ, William B. Moran ("Moran"), was

improper because it was made in violation of 35 U.S.C. § 32 in that Moran was not an employee

of the PTO, and because he was not intimately familiar with patent law and therefore lacked the

qualifications to decide his case.  Pl.'s Opp'n at 31-32; Req. for Recon. at 23-24.  The PTO

responds by arguing that § 32 does not mandate the appointment of a PTO employee, but rather

provides for the appointment of a PTO employee at the discretion of the Director.  Def.'s Reply at

18-19 (citing GC Decision at 16-18).  With respect to Bender's argument that the ALJ lacked

expertise in patent law, the PTO contends that it was Bender's "obligation to provide any

explanation necessary for the ALJ to understand his arguments."  Id. at 19 (citation omitted).

35 U.S.C. § 32 provides, in relevant part, that "[t]he Director shall have the discretion to

designate any attorney who is an officer or employee of the United States Patent and Trademark

Office to conduct the hearing required by this section." (emphasis added).  Bender argues that this

provision requires the PTO to designate an officer or employee of the PTO, while the PTO argues

that the statute merely gives the Director authority to make such a designation if in his discretion

he chooses to do so.  GC Decision at 16-18.  As a congressional enactment, the analysis required

by Chevron, 467 U.S. at 842-845, governs the resolution of this dispute.  Under Chevron, the

language of the provision at issue cannot be evaluated under Chevron's first step, as it is not clear

whether the provision permits a non-PTO employee to be appointed as the ALJ.  Id.  Under

Chevron's second step, the agency interpretation of the statute must be afforded deference and

upheld if it is reasonable.  Id.  The PTO points to the legislative history of the provision, which

indeed confirms that the PTO's interpretation is reasonable in light of the language of the statute

itself.  GC Decision at 16-18.  35 U.S.C. § 32 was amended in 1999, and the legislative history of

the amendment indicates the following:

> Suspension or exclusion from practice. Under existing § 32 of the Patent Act, the
> Commissioner (the Director pursuant to § 632 of this Act) has the authority, after
> notice and a hearing, to suspend or exclude from further practice before the PTO
> any person who is incompetent, disreputable, indulges in gross misconduct or
> fraud, or is noncompliant with PTO regulations. Section 620 permits the Director
> to designate an attorney who is an officer or employee of the PTO to conduct a
> hearing under § 32.

H.R. REP. 106-287 (1999) (emphasis added).  As the PTO correctly notes, the legislative history

of the amendment supports the conclusion that the amendment was intended to be permissive,

rather than mandatory, with respect to the appointment of an ALJ.  Therefore, the Court concludes

that the PTO's interpretation is reasonable and that the appointment of the ALJ was therefore

proper.

This Court also rejects Bender's challenge to the appointment of the ALJ based on his lack

of expertise in patent law.  The case before the ALJ concerned issues of professional conduct of

an attorney, and while the issues presented implicated some aspects of patent law, the ultimate

question concerned whether Bender engaged in conduct that violated the PTO's disciplinary

regulations.  While knowledge of patent law might have provided some assistance to the ALJ, it

was not essential.  The administrative record contained ample information from which the ALJ

could reasonably assess whether there was substantial evidence that Bender violated certain

disciplinary regulations without having the expertise in patent law.  This Court also finds the

PTO's argument and reference to the record persuasive with respect to its conclusion that Bender

had an obligation to clarify issues of patent law for the ALJ when clarification was necessary.

Furthermore, to the extent that there were "misunderstandings" of patent law by the ALJ bearing

on material facts undergirding the violations found by the ALJ, his evaluation of the record was

ultimately scrutinized by the PTO's General Counsel in his GC Decision, which provided an

additional analysis and explanation of the relevant factual matters and legal principles that led to

the conclusions that were reached in this case.  Accordingly, the appointment of Moran as the ALJ

provides no basis for disturbing the decision rendered by the PTO, as the appointment was proper

and not made in violation of 35 U.S.C. § 32.

    4.    Was Bender prejudiced by the delay of the proceedings?

    Bender argues that the length of the proceedings did not comport with due process and was

prejudicial.  Pl.'s Opp'n at 46-47; Appeal Brief at 86-87.  Specifically, he alleges that Moatz's

involvement in the investigation of his case created a "will to win" on Moatz's part when he was

then promoted to the position of Director of the OED.  Pl.'s Opp'n at 47.  Thus, Bender argues

that if the complaint had been brought earlier, there at least would not be an "appearance of

prejudgment and bias".  Id. (emphasis in original).  He also argues that Moatz, due to his

extensive involvement in the case and his desire to win, failed to engage in "reasonable"

settlement negotiations as called for in 37 C.F.R. § 10.131(g) (2000).[21]  Pl.'s Opp'n at 47.  Bender

also contends that because he complained to Moatz's supervisor about "abuses" that Moatz

---

[21] Bender acknowledges that the Director entered into settlement negotiations with his counsel during the hearing, but contends that the Director's position was unreasonable because the settlement offer called for Bender's "immediate suspension which was the equivalent of exclusion."

48

allegedly engaged in, "there is an extremely high risk in the present case that the OED Director harbored an intense "will to win." Id.  The PTO counters, arguing only that Bender's contention that he was prejudiced because Moatz did not engage in reasonable settlement negotiations lacks merit because he had "no legally cognizable right to a settlement of pending charges under any specific terms" and because the range of settlement possibilities, or the decision not to enter into a settlement at all, were "well within the agency's discretion."  Def.'s Rep at 23 (citing Heckler v. Chaney, 470 U.S. 821 (1985).

Bender's challenge to the PTO's decision predicated on the delay in resolving his case is unpersuasive.  His claim that a complaint instituted prior to Moatz's promotion to the position of Director of the OED would have been free of bias or the appearance of bias is unfounded because, as already noted, Bender has not specifically established any actual bias.  His argument concedes as much when he states that had a different agency decision maker been involved, the "present proceeding might have been avoided." Pl.'s Opp'n at 47 (emphasis supplied).  This argument, combined with the fact that only the "risk" and "appearance" of bias are alleged, is insufficient to establish that the delay resulted in actual prejudice.  Similarly, Bender has failed to identify any specific record evidence that supports his supposition that Moatz had an intense "will to win."  Rather, all he has offered is pure speculation.  And as to Bender's argument regarding settlement process, this Court's review is again constrained by the requirement that deference be accorded to an agency's interpretations of its own regulations.  See, e.g., Thomas Jefferson Univ., 512 U.S. at 512.  Under this standard, the Court declines to disturb the Director's decision regarding what constitutes a "reasonable" settlement under 37 C.F.R. § 10.131(g).  Accordingly, there is no basis for this Court to conclude that Bender was prejudiced by the delay in resolving his case.

49

## IV.  Conclusion

For the foregoing reasons, this Court denies Plaintiff's motion for summary judgment and grants Defendant's motion to for summary judgment.[22]

**SO ORDERED** on this 13th day of January, 2006.

REGGIE B. WALTON
United States District Court Judge

---

[22] An order consistent with this memorandum opinion is being issued contemporaneously herewith.